# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | | |
|---|---|---|
| George B. Meligan | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CV 50295 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

In the last decade of his work career, plaintiff George B. Meligan was a truck driver. He periodically suffered what he described as mental breakdowns, causing him to change jobs or stop working temporarily or even be hospitalized.[2] He eventually bought his own truck and formed a company which consisted of him driving a single route from Rochelle, Illinois to Cookeville, Tennessee transporting frozen potatoes. He sometimes hired others to drive the route, paying them a flat fee. His wife and daughter helped with bookkeeping. In 2012, he suffered another breakdown that caused him to be hospitalized. He was then diagnosed with bipolar disorder. Four months later, he started driving again, although only part-time, and eventually quit driving in May 2013 because he got into five accidents.[3] Although plaintiff and his wife continued the business for a time using the flat-fee drivers, they eventually sold it in 2014, and later divorced. In April 2014, plaintiff applied for disability insurance benefits based on his mental problems as well as a degenerative back problem. He was then 57 years old.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] This history of breakdowns is based on plaintiff's testimony, and was not confirmed by medical records.
[3] Plaintiff's work history shows that he had earnings every year (except one) from 1973 to 2013. R. 163.

1

In February 2016, a hearing was held before an administrative law judge ("ALJ"). Plaintiff was represented by counsel, but the ALJ asked all the questions.[4] The bulk of the questions focused on the details of plaintiff's truck driving jobs. The ALJ only briefly addressed plaintiff's back problems. Plaintiff testified that his doctors told him in 2011 that he had degenerative arthritis. Since then, the problem "gradually got worse." R. 49 ("You drive a semi-truck, you're, kind of, bouncing up and down."). He had shooting pain going down the back of his legs. The ALJ asked whether he was treated for this problem. Plaintiff answered as follows: "I've been taking Ibuprofen, 800 milligrams, three times a day. My insurance will not cover any other treatment. My doctor pretty much told me that's all he can do for me." R. 50. The ALJ noted that plaintiff's psychiatrist, Dr. Jafry, had urged him to exercise more to help his anxiety. Plaintiff stated that he walked his dog twice a day, going a quarter of a mile in 20 minutes. He did not do other physical activity because his back hurt too much. He had trouble tying his shoe. No further questions were asked about his back problems.

The ALJ called Dr. Mark Oberlander to testify about plaintiff's mental impairments. Dr. Oberlander opined that plaintiff had a documented impairment of bipolar disorder. However, Dr. Oberlander concluded that plaintiff could work subject to certain limitations (*e.g.* simple routine work) because he was relatively stable on psychotropic medications.[5] Dr. Oberlander's testimony only addressed psychiatric impairments. For an inexplicable reason, the ALJ did not call any other medical expert.

---

[4] Plaintiff's counsel later complained to the Appeals Council about this fact. *See* R. 322 ("It is important to note that during the hearing, the ALJ did not give the undersigned the opportunity to question Claimant, the Medical Expert and the Vocational Expert; rather, the ALJ asked questions of these three individuals."). Plaintiff's current counsel does not raise any argument about this issue, and the Court notes that counsel at the hearing never asked to question the witnesses. Still, the Court urges the ALJ to explicitly offer counsel an opportunity to question the witnesses. The record was undeveloped on a number of points, and questioning from counsel may have avoided some of these problems.

[5] These medications included Klonopin, Risperdal, Trileptal, and Cymbalta. R. 52.

In her decision, dated April 7, 2016, the ALJ relied heavily on Dr. Oberlander's testimony. The ALJ first found that the bipolar disorder and degenerative disc disease were severe impairments. The ALJ then concluded that plaintiff had the residual functional capacity ("RFC") to do medium work if he were limited to simple, routine tasks and had only brief contact with the public (essentially Dr. Oberlander's proposed RFC). The bulk of the decision focused on plaintiff's credibility. In discussing the medical history, the ALJ offered several reasons why plaintiff was not believable. These included plaintiff's ability to do certain activities such as going to church, the lack of objective evidence showing significant back problems, and plaintiff's sparse treatment history. In addition, the ALJ noted various factual inconsistencies, one being a murky accusation that plaintiff's wife may have been improperly receiving disability insurance benefits when she worked as a bookkeeper for plaintiff's company. However, perhaps the most damaging accusation—one set forth at the outset which seemed to color the subsequent credibility analysis—was the claim that Dr. Oberlander believed plaintiff was malingering. Or, in the more euphemistic language used by the ALJ, Dr. Oberlander supposedly opined that plaintiff was "magnifying his symptoms" for the "secondary gain of disability." R. 21. In schoolyard parlance, according to the ALJ, Dr. Oberlander testified plaintiff was a "big faker."

Neither side addresses the latter assertion, which is somewhat surprising given how damaging it seems to be. This Court, however, will comment on it at the end of this opinion because it rests on a fundamental error. But first the Court will consider plaintiff's three specific arguments for remand. They focus on the back issue. In making these arguments, plaintiff asserts more generally that "the threshold for disability is quite low." Dkt. #12 at 7. This is based on social security regulations providing that, given plaintiff's age, work experience, and non-exertional limitations, he may only be found *not* disabled if he is capable of medium work.

Under the regulations, medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds" and the claimant additionally must be able to do the requirements of light work which may involve "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567. Plaintiff emphasizes this low burden because, as he concedes, his "medical history may not display the type of severe back complaints that might be disabling on their own." Dkt. #12 at 9.

**I.     Medical Expert.**

Plaintiff's primary argument is that the ALJ should have called a medical expert to analyze the back evidence. There is no dispute that no doctor offered an opinion about plaintiff's back problems. Although the ALJ called Dr. Oberlander to testify about plaintiff's mental impairments, the ALJ for some reason chose not to call an expert to assess the physical impairments. There was likewise no consultative examination, and the ALJ gave no weight to the two opinions from the State Agency doctors. Given these facts, plaintiff argues that the ALJ necessarily "played doctor" in analyzing the medical tests and examination findings. *See Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (ALJs may not "play doctor" by making medical judgments unsupported by medical opinion testimony).

The Government responds by characterizing the ALJ's decision as resting more on a layperson evaluation of plaintiff's subjective statements. *See* Dkt. #18 at 3 ("Though plaintiff's heading suggests that his argument focuses on medical opinions, most of his argument actually boils down to an assertion that the ALJ should have viewed his subjective complaints differently."). The Government then emphasizes the multiple credibility rationales relied on by

the ALJ. The Court does not find this argument persuasive for two reasons. First, the ALJ explicitly stated that the lack of objective evidence was one reason for discounting plaintiff's subjective statements. R. 19 ("The objective medical evidence generally provides little support for the extent to which the claimant alleges he is limited."). Second, as discussed later in this opinion, the Court rejects several of the ALJ's other credibility rationales.

The Government's other argument is that the ALJ did not "impermissibly interpret" the MRIs and other tests, but merely "reasonably considered" them. Dkt. #18 at 4. The Court is not clear what the Government means by this distinction or whether, if there is a distinction, it is meaningful. As explained below, Court finds that the ALJ engaged in a layperson analysis of the medical evidence.

As a background point, it is true that plaintiff did not receive extensive treatment for his back problems. For example, as the ALJ noted, there was a gap from March 2013 until April 2015 during which time plaintiff did not mention his back pain to doctors. As noted above, plaintiff implicitly acknowledges that his back problems may not be as severe as some disability claimants. Still, he maintains that there was objective evidence supporting his allegations and that the ALJ overlooked, misinterpreted, or cherry-picked this evidence.

He focuses on two pieces of evidence—an X-ray taken in April 2015 and a lumbar MRI performed in May 2015. The X-ray showed "*prominent* diffuse degenerative disk changes throughout the lumbar spine." R. 447 (emphasis added). Relying on this X-ray, plaintiff's doctor (Dr. Martinez) prescribed Nabumetone for back pain and advised plaintiff to "avoid bending, twisting, reaching." R. 448. As for the MRI, plaintiff notes the report stated (among other things) that he had "marked disc space narrowing L1/L2 through L5/S1 with endplate degenerative changes at all levels" and "moderate neural foraminal narrowing L5/S1 on the left." R. 452.

5

According to plaintiff, these findings undercut the ALJ's claim that his back problem was either insignificant or temporary. (Of course, by stating as much, plaintiff's counsel is likewise playing doctor.)

The ALJ acknowledged some, but not all, of these statements. The ALJ also focused on other statements not highlighted by plaintiff. In short, the ALJ was choosing which points to highlight. Choosing which evidence to credit is obviously not inherently improper. But making those choices is improper when they required medical judgment and no expert has provided testimony to support them. As for the X-ray, the ALJ acknowledged Dr. Bernstein's finding that there were "prominent" disc changes; however, the ALJ never attempted to reconcile this evidence with the ALJ's seemingly contrary conclusion that the objective evidence provided little support for plaintiff. Moreover, the ALJ only obliquely referenced Dr. Martinez's advice that plaintiff should avoid bending, twisting, and reaching and did not explain why she discounted it. Plaintiff argues that this advice was in "direct contradiction" to the ALJ's conclusion that he could do medium work.

As for the MRI, the ALJ stated the following: "An MRI on May 13, 2015 showed only degenerative changes but no significant canal stenosis or nerve root impingement (Ex. 10F/6)." R. 22. Although this statement superficially resembles a factual statement involving no medical interpretation, the word "only" carries an implied judgment that this was the only conclusion reached. But the ALJ did not acknowledge other findings from the same report, in particular the two statements quoted above ("marked disc space narrowing" and "moderate neural foraminal narrowing"). It is possible that these findings emphasized by plaintiff were not significant, but this is a judgment that should have been made by an expert—not by the ALJ, counsel or the Court.

This conclusion—that the ALJ was engaged in a layperson interpretation of the MRI and X-ray—is indirectly confirmed by the ALJ's statement at the very end of the administrative hearing. The ALJ stated the following in an exchange with plaintiff's counsel:

> ATTY: Judge, it appeared to me that the complaints about the back definitely intensified in April, which prompted the ordering of X-rays and an MRI, which took place in May.
>
> ALJ: And I have to decide what the X-ray showed, and [what the] MRI showed. And I will—I'll think about what I'm going to do.

R. 62-63. This statement is an acknowledgement that this evidence was significant and that the ALJ would be the person "deciding" what it "showed."

In addition to doctor playing, a more general criticism is that the ALJ simply never confronted the precise question of whether plaintiff could *frequently* lift up to *25 pounds* five days a week and also do the other requirements of medium work. The ALJ did not discuss the specific requirements of medium work. Instead, the ALJ framed the issue in very general way—namely, whether plaintiff could "lift, squat, bend, stand, walk, and kneel." R. 22. But this formulation gives no consideration to the specific lifting and other requirements of medium work. On remand, the ALJ should provide a more fine-tuned analysis.

**II. Insurance.**

Plaintiff argues that the ALJ failed to give serious consideration to his explanation that his insurance prevented him from getting more treatment. The parties do not spend much time on this argument. It is well-established that an ALJ has a duty to first ask a claimant about, and explore a claimant's explanations regarding, treatment inconsistencies before drawing any negative inferences. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).

At the administrative hearing, plaintiff repeatedly referred to insurance problems. *See* R. 50 ("My insurance will not cover any other treatment."); R. 52 ("Insurance will not cover it,

ma'am. I've tried."); R. 53 ("due to my finances and no insurance, that's all I can do"). The ALJ did not follow up on these statements in any serious way other than at one point raising doubts about the plaintiff's assertion that his insurance did not cover physical therapy. R. 50. In the decision, the ALJ addressed this issue as follows:

> [W]hile financial constraints may make medical intervention and compliance more difficult, a lack of health insurance does not equate to a finding of disability. Moreover, the evidence reveals the claimant did not exhaust all efforts to seek treatment for his physical impairments, with no evidence of visits to free or subsidized clinics, suggesting that his physical impairments were not as limiting as alleged.

R. 23. The first assertion—that financial constraints do "not equate to a finding of disability"—is a straw-man truism that skirts the relevant issue. The second assertion—that plaintiff did not visit free clinics—is potentially a valid counter-explanation, but the ALJ did not develop the record by questioning plaintiff about this possibility. The ALJ should have explored this issue further.

### III. Activities.

Plaintiff argues that the ALJ relied on activities not relevant to whether he could do the vigorous requirements of medium work. This Court agrees. The ALJ cited plaintiff's activities as a reason to discredit his allegations. *See* R. 21; R. 23-24. But the ALJ failed to explain why these activities undercut plaintiff's claims. Why do routine activities such as going to church, doing personal grooming, driving a car, and even taking a vacation to Florida demonstrate that he could frequently lift 25 pounds and could stand and walk for sustained periods? There was nothing in plaintiff's written statements that these activities were even mildly strenuous or required *any* lifting—or were done frequently. At the hearing, the ALJ only asked one question on this topic, which was whether plaintiff exercised, and plaintiff testified about his two daily dog walks. Here again, the ALJ should have developed the facts in greater detail.

8

Based on the above arguments, the Court finds that a remand is required. As promised, the Court will comment on the ALJ's claim that Dr. Oberlander doubted plaintiff's truthfulness. The ALJ stated as follows:

> Based on his review of the entire record, Dr. Oberlander opined that the claimant seems to be focused on magnifying his symptoms, focusing on his problems and possibly the secondary gain of disability, rather than recognizing his good response to treatment and the various activities in which he does participate, which include driving trips, vacations, and regular church attendance.

R. 21. The ALJ also stated that Dr. Oberlander found that plaintiff "tended to amplify his symptoms" and also that his GAF score of 48 was inconsistent with the record. R. 20. The ALJ suggested that Dr. Oberlander reached these conclusions based on contradictions in plaintiff's testimony. In particular, the ALJ suggested that Dr. Oberlander doubted that plaintiff had numerous breakdowns because there were no treatment records available.

The problem with this line of argument is that, insofar as this Court can tell, Dr. Oberlander never made any of the above-described assertions. The Court has read the hearing transcript several times and cannot find any statement in which Dr. Oberlander either explicitly stated that plaintiff was malingering or indirectly suggested as much. As for the suggestion that Dr. Oberlander thought plaintiff was fabricating the mental breakdowns because there were no treatment records, Dr. Oberlander again did not make such a statement. He did, however, ask plaintiff's counsel whether there were any records of these breakdowns, but after counsel stated that none were available (no explanation was given for why), Dr. Oberlander proceeded with his testimony and did not comment further on this issue. In fact, he later stated that plaintiff's memory was "outstanding" based on his testimony about details of his long-ago work history. R. 59. In sum, the ALJ misstated the testimony of Dr. Oberlander. The ALJ appears to have acted as a ventriloquist, disguising her own opinions and misleadingly projecting them through the voice

9

of Dr. Oberlander. Needless to say, this error severely undermines the ALJ's entire decision. Therefore, even if the above three arguments were not meritorious, this Court would still remand based on this reason alone. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ's credibility determination "misstated some important evidence and misunderstood the import of other evidence"). On remand, the ALJ should be more careful in summarizing the record and attributing opinions to those who actually made them.

In sum, on remand, the ALJ must call a medical expert or otherwise develop the record to address these questions. *See* HALLEX I-2-5-34A.1. In remanding this case, the Court is not indicating any opinion about the ultimate outcome. This remand will also allow the ALJ to consider the additional post-hearing medical evidence not previously available to the ALJ. *See* Ex. 13F.

**CONCLUSION**

For all the above reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: November 17, 2017   By: _____
Iain D. Johnston
United States Magistrate Judge